# EXHIBIT A

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL21000519-00

WINCHESTER ................................................................................................ Circuit Court

5 NORTH KENT STREET, WINCHESTER   -

ADDRESS

TO:

SHENANDOAH UNIVERSITY, TRACY FITZSIMMONS, PRESIDENT

1460 UNIVERSITY DRIVE

WINCHESTER, VA 22601-

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

OCTOBER 20, 2021                GARDNER, WILLIAM D _____ Clerk
DATE

by   /S/ STEELE, MELISSA _____
DEPUTY CLERK

Instructions:

Hearing Official: ........................................................................................

FORM CC-1400 MASTER 10/13

Uploaded: 2021OCT20 10:37 Filed By:Bar# 68664 NSIMOPOULOS Reference: EF-92200
E-Filed: 2021OCT20 WINCHESTER CC MESTEELE at 2021OCT20 14:55 CL21000519-00

**IN THE CIRCUIT COURT FOR THE CITY OF WINCHESTER, VIRGINIA**
**CIVIL DIVISION**

| | |
|---|---|
| **JOHN DOE,** )<br><br>     **Plaintiff,**   )<br><br>**v.**   )<br><br>**SHENANDOAH UNIVERSITY,**   )<br><br>     **Defendant.**   ) | Civil Action No. _____ |

## COMPLAINT

Plaintiff John Doe ("Doe") files this Complaint against Defendant Shenandoah University ("Defendant"). Doe claims herein that Defendant, throughout the course of his graduate studies in Defendant's Physician Assistant Studies Program ("PA Program"), continually discriminated against him and subjected him to a hostile learning environment because of his race and disability, in violation of Title VI of the Civil Rights Act of 1964, Title III of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act. While so doing, Defendant also, Doe claims herein, falsely defamed Doe as a danger to patient safety, all of which ultimately led to Doe's dismissal from the PA Program. In short, Defendant's conduct above was wrongful and has erroneously and unjustly ended Doe's hope of pursuing a career not only as a Physician Assistant ("PA") but also as a healthcare provider. For these reasons, Doe seeks relief here. In support of his claims, he alleges as follows:

### PARTIES-JURISDICTION-VENUE

1.      Doe is an individual and natural person and, at all times relevant, was a resident of Winchester, Virginia:

1

2.     Defendant is a private educational institution and place of public accommodations located in Winchester, Virginia. In relevant part, it operates the PA Program in its School of Health Professions. Defendant accepts federal financial assistance or funding in the operation of its programs and activities.

3.     This Court has subject matter jurisdiction over this Complaint, pursuant to Virginia Code § 17.1-513.

4.     This Court has personal jurisdiction over Defendant, pursuant to, *inter alia*, Virginia Code §§ 8.01-328.1(A)(1) and (3), because Defendant transacts business and injured Doe by its conduct in Virginia.

5.     Venue is proper in this Court, pursuant to, *inter alia*, Virginia Code §§ 8.01-262(1) and (4), because Defendant has its principal office and because the cause(s) of action and injuries, *infra*, arose and occurred in Winchester, Virginia.

## FACTS

6.     Doe incorporates here the allegations in paragraphs 1-5, *supra*.

7.     Doe is African-American. He was born in Nigeria, emigrated to the United States, and ultimately became a permanent resident here.

8.     Prior to his enrollment in the PA Program, Doe attended graduate school and worked as an epidemiologist in the United States. Ultimately, he decided to return to school. Doe hoped to pursue a career in healthcare, particularly as a PA.

9.     In July of 2018, Doe enrolled in the PA Program. By virtue of his experience and admission, Doe was qualified for Defendant's PA Program and possessed the background, character, and education necessary to become a competent PA.

2

10.     Shortly before entering the PA Program, Doe experienced difficult personal circumstances, including a separation from his wife and a child custody dispute. As a result, Doe started the PA Program in the Class of 2020 but then he had to decelerate to the Class of 2021.

11.     The Class of 2020 and Class of 2021 were predominantly non-African-American. Thus, Doe, as an African-American, was a minority in these cohorts.

12.     At the end of the 2018 summer semester, Doe decelerated his enrollment. Prior to the deceleration, he had completed the five (5) week summer semester and had earned a 4.0 G.P.A. His deceleration was unrelated to academics.

13.     As a result of his personal circumstances above, Doe began to suffer and was diagnosed with Social Anxiety Disorder ("SAD").

14.     SAD is a mental health condition characterized by extreme fear of social settings. SAD is chronic and may be debilitating. Symptoms of SAD include, but are not limited to, (a) the physical - blushing, nausea, excessive sweating, trembling or shaking, difficulty speaking, dizziness or lightheadedness, and anxiety/panic attacks, and (b) the psychological – intense worry, avoidance of situations, irrational fear of embarrassment and being judged, and significant anxiety.

15.     A person suffering from SAD may experience impairments in one or more of the major life functions of communicating, concentrating, interacting, learning, socializing, and thinking. These impairments are substantial as compared to persons in the general population.

16.     Upon such an experience, SAD is a disability.

17.     Suffering from SAD, Doe was disabled. SAD caused Doe the above physical and psychological symptoms and, when exacerbated, substantially impaired his major life functions above as compared to persons in the general population.

18.     Doe required medication at all relevant times to manage and treat his SAD.

3

19.    In the summer of 2019, Doe returned to the PA Program. Upon his return, he took three credit hours and earned a G.P.A. of 3.0.

20.    The next semester, or the fall of 2019, Doe took 15.5 credit hours and earned a 2.27 G.P.A.  Specifically, he earned the letter grades of five "C"s, one "B," and one "A." This semester was the only semester in the PA Program in which Doe earned a G.P.A. under 3.0.

21.    Throughout his enrollment in the PA Program, Doe had also never earned a "D" or "F" letter grade in any course.

22.    Doe's academic performance during the fall of 2019 was not the result of a lack of ability, competency, effort, intelligence, or qualifications.  Rather, Doe had been struggling with an exacerbation of his SAD.  Doe kept his struggle private, as he was afraid that disclosure of this disability may lead to others, particularly Defendant, erroneously perceiving him as unfit for the PA Program.

23.    Doe's fears were reasonable, particularly in the medical education context.  (*See, e.g.,*    https://sds.ucsf.edu/sites/g/files/tkssra2986/f/aamc-ucsf-disability-special-report-accessible.pdf at p. 7 (reporting that "[s]tigma surrounding psychological disabilities and fear of disclosure in this high-stakes [medical education] environment remain disincentives to disclosure" and  "students do not practice help-seeking behavior because they feel that seeking help is a sign of personal weakness; fear negative attitudes about mental health treatment from program directors, supervisors, peers, and patients; and have concerns about the potential implications on their future of a known diagnosis") (alteration added).

24.    Despite his personal privacy interest, Doe concluded after the fall of 2019 that he needed help and, thus, had no choice but to disclose his disability to Defendant.  On December 3, 2019, he registered with Defendant's disability services office and notified Defendant of his SAD.

4

He requested accommodations. Defendant approved his request, providing Doe the accommodations of (a) time and a half for all quizzes and examinations and (b) testing in a quiet, distraction-free environment.

25.     Defendant's approval of Doe's requested accommodations acknowledged Doe's disability and demonstrated the facial reasonableness of his accommodations.

26.     Having had his accommodations approved, Doe committed himself to improving his academic performance starting in the spring 2020 semester.

27.     Defendant dealt Doe a swift blow, however. That is, approximately two weeks after Doe's disclosure of his disability to Defendant, on December 20, 2019, Defendant's Professor Anthony Miller ("Professor Miller") contacted Doe and informed him that Defendant's Promotions and Retentions Committee (the "PRC") had voted and recommended his dismissal from the PA Program. On behalf of Defendant, the PRC was composed of PA Program faculty, was responsible for evaluating students' progress in the PA Program, and made recommendations and decisions concerning student discipline, as warranted.

28.     Doe was devastated.

29.     At the time, Professor Miller was the Director of the PA Program. Notifying Doe of the PRC's recommendation, he informed Doe that the PRC's purported rationale was that Doe's G.P.A. was "significantly less than 3.0" and "it would be a significant challenge to achieve academic success by the end of the Spring Semester." He informed Doe that the PRC had taken into account Doe's earlier deceleration, despite the fact it was unrelated to academics.

30.     Stated differently, Professor Miller essentially conveyed to Doe the message that Defendant's PRC had already determined Doe was personally and academically unable to succeed in the PA Program.

5

31.     Doe immediately regretted his decision to disclose his disability to Defendant, as he reasonably believed the timing of the PRC's recommendation was directly proximal and related to that disclosure. Indeed, upon information and belief, given the small size of the PA Program, the PRC became aware of not only Doe's personal circumstances, but also of his disclosed disability.

32.     Prior to the above recommendation, the PRC had not even considered a lesser sanction first. After all, it possessed broad discretion to recommend lesser sanctions.

33.     And the PRC should not have been considering Doe's dismissal at the time, pursuant to the policy in the PA Program's Student Handbook. First, Doe had not earned a "D" or an "F" letter grade in any course during the fall of 2019. Second, his cumulative G.P.A. had not dropped below a 3.0 for two consecutive semesters. Thus, the PRC deviated from policy and accelerated a dismissal process against Doe. The PRC had determined that, in sum, Doe was unfit for the PA Program.

34.     Professor Miller placed a phone call to Doe and informed him about the PRC's recommendation. Upon Doe's references to Defendant's applicable policies concerning dismissal, Professor Miller was constrained to reject the recommendation. He permitted Doe to advance to the spring 2020, semester and placed Doe on academic probation.

35.     However, Professor Miller also imposed conditions upon Doe above and beyond academic probation. He required Doe to increase his cumulative G.P.A. above 3.0 by the end of the spring 2020 semester and, if he did not do so, Defendant was to dismiss him automatically. At the time, Doe's cumulative G.P.A. was only a 2.4737.

36.     Miller's automatic dismissal condition was inappropriate. In fact, the Student Handbook did not require an automatic dismissal if a student in the PA Program failed to achieve

6

a 3.0 G.P.A. in two consecutive semesters. Rather, it only required the PRC to consider dismissal as a sanction.

37.     Furthermore, Professor Miller's condition that Doe improve his cumulative G.P.A. to a 3.0 by the end of the spring 2020, semester was unrealistic. Such an improvement was difficult for any student to achieve, let alone a student with a chronic disability.

38.     Understandably, these non-coincidental, accelerated, inappropriate, and unreasonable conditions and requirements were unwelcomed and placed Doe under a significant amount of stress, causing him anxiety and an exacerbation of his SAD.

39.     Nonetheless, Doe had no choice but to follow the requirements.

40.     At the time, Doe was unaware of any other similarly-situated student in his cohort of a different race and/or disability status whom PRC expected to improve so dramatically over such a short period of time or who was subject to such conditions. In short, Doe was singled out for more harsh treatment.

41.     Per Professor Miller, Doe was required to have a remediation plan prepared by his Defendant faculty advisor Erika Francis. The Student Handbook provided, "[s]tudents encountering academic difficulties (knowledge, skills or professionalism) at the exam, assignment, or course level will meet with their faculty advisor to develop a remediation plan. Implementation of the plan and follow through will be considered by the [PRC]."

42.     Doe's remediation plan, as prepared by Defendant, was deficient in substance, lacked measurable goals, and was not calculated to ensure Doe's progress in the PA Program.

43.     Following the imposition of Doe's so-called remediation plan, the COVID-19 pandemic struck. The pandemic negatively affected and changed Defendant's learning

environment, including for Doe. The impact on Doe was measurable. Doe worked hard but was only able to earn a G.P.A. of 3.057 in the spring 2020, semester.

44.     During the summer of 2020, Professor Miller, who was aware of Doe's disability, notified Doe that the PRC had recommended he be retroactively promoted to the summer 2020, term. Nevertheless, he recommended that Doe "consider withdrawing from Summer Two classes" on the grounds that "the faculty and I are sensitive to the financial impact of your schooling especially if you are unable to complete the PA program because of restrictions to the clinical phase of the program." He informed Doe that "[w]hen the [PRC] meets at the end summer, they will be faced with recommending dismissal based on [your] probation and your inability to achieve a 3.0 by the end of Spring and by the end of Summer (one additional term) beyond the agreement."

45.     Despite Professor Miller's obvious attempt to dissuade Doe from continuing in the PA Program, Doe did not withdraw from his nine credit hours of Summer Two classes. Rather, he completed them and earned a G.P.A. of 3.857.

46.     Notwithstanding this remarkable progress, on August 26, 2020, Professor Miller's replacement, namely Program Director Anne Schempp ("Director Schempp"), notified Doe that the PRC had voted a *second* time to dismiss him. Director Schempp notified Doe that she accepted the recommendation because Doe's cumulative 2.93 G.P.A. at the end of the summer 2020 semester failed to achieve a 3.0. G.P.A. as required by the conditions of Doe's academic probation. She explained that Doe had agreed to his automatic dismissal upon failure to meet this condition.

47.     Doe does not recall ever agreeing, certainly not voluntarily, to such a condition.

48.     Professor Schempp's reliance upon the "automatic dismissal" condition was inappropriate because Professor Miller did not have authority to impose such a condition.

8

49.     Further, while it was appropriate for the PRC to at least consider dismissal as an option following two consecutive semesters in which a student's cumulative G.P.A. was below 3.0, it was Doe's understanding that PRC as a matter of custom and practice offered more extensive remediation to students before recommending dismissal.

50.     For example, upon information and belief, a fellow non-African-American student in the Class of 2020 was offered repeated remediation support by the PRC after earning an "F" letter grade, being dismissed for the same, and then, after reinstatement, failing to achieve the required 3.0 cumulative G.P.A. in the PA Program for more than two consecutive semesters. After 16 months in the didactic phase of the PA Program, this student had not attained a cumulative G.P.A. of 3.0. Rather than voting to dismiss her, the PRC extended her academic probation and then voted to delay her promotion to the clinical year so that she could complete a comprehensive remediation plan to increase her cumulative G.P.A.

51.     Upon information and belief, the PRC did not vote to dismiss the above student upon her readmission in to the program even while her cumulative G.P.A remained below the required 3.0. Nor did her extensive remediation plan, unlike Doe's limited remediation plan, threaten her with the condition of "automatic dismissal." Ultimately, Defendant significantly assisted and graduated this student, after providing her, unlike Doe, the tools she needed for progress and success.

52.     Upon information and belief, the degree of support provided to this non-African-American student was illustrative of the PRC's custom and practice in responding to a student experiencing academic difficulties. However, Doe, as a disabled, African-American, did not receive the same.

53.     Also, the Student Handbook repeatedly suggests that remediation, not automatic dismissal, is an appropriate step prior to the dismissal of a student who has fallen out of good academic standing.

54.     The PRC, as was evident, never considered providing Doe with substantive remediation in August of 2020 or took into account his compliance with the spring 2020, remediation plan.

55.     On August 28, 2020, Doe appealed his dismissal.

56.     On September 2, 2020, Defendant's School of Health Professions Dean Karen Abraham granted Doe's appeal and reinstated him as a student in the PA Program. Dean Abraham informed Doe, however, that his failure to achieve a cumulative 3.0. G.P.A. by the end of the fall 2020 semester would result in his automatic *and permanent* dismissal.

57.     Again, the unique threat of an "automatic dismissal" was unsupported by the terms of the Student Handbook yet it was a consistent and persistent threat against Doe. And neither Dean Abraham nor any other person in the PA Program offered Doe substantive remediation of any type to assist him in raising his cumulative G.P.A. Nevertheless, through his own hard work and perseverance, Doe took 16.5 credit hours of courses during the fall 2020 semester and earned a G.P.A. of 3.468. In the end, he had successfully raised his cumulative G.P.A. to a 3.076.

58.     Nonetheless, on December 11, 2020, Defendant's Associate Professor Stephanie Bernard ("Professor Bernard"), who was the acting Interim Program Director during Director Schempp's maternity leave, notified Doe that the PRC had met and recommended his dismissal a *third* time from the PA Program.

59.     Professor Bernard accepted the PRC's recommendation. She reasoned that Doe had failed to pass his fall 2020 Objective Structured Clinical Exam ("OSCE") after two attempts.

10

60.    The OSCE is a time-limited practical exam conducted at the end of certain semesters in the PA Program and consists of a set of predefined stations related to patient care. In fall of 2020, the OSCE assessment took place on November 18, 2020 and consisted of six individually-scored stations. Students were provided with a time limit of six minutes per station.

61.    Doe took the OSCE on November 18, 2020 and scored well above the benchmark on each station except Station 6 – Clinical Procedures. He was informed that he had allegedly scored a 60% on Station 6 (5% below the required benchmark of 65%) but he was not informed what he had done incorrectly. Doe was not offered any opportunity to develop a remediation plan, in deviation of the policies in the Student Handbook.

62.    Instead, Defendant automatically scheduled Doe for a retake of Station 6 two days later, on November 20, 2020, with no additional support. On his second attempt to complete Station 6, Doe scored an 85% - 20 percentage points above the benchmark.

63.    Despite scoring above the benchmark on his retake of the OSCE, Doe was notified on November 20, 2020, that "you did not pass your retake for the Didactic Summative OSCE Examination because you did not achieve the benchmark of 65% on the station you retested today."

64.    Again, Doe was not notified why he had allegedly failed the OSCE on either attempt until December 12, 2020, or the day after Professor Bernard accepted the PRC's recommendation to dismiss him again.

65.    Professor Bernard met with Doe and informed him that he had failed the OSCE because he allegedly offered the object (a square piece of cushion foam) in Station 6 of each exam the wrong medication. It was only at this point that Doe realized that the medication vials used during the OSCE must have been different from the vials used during practice in class labs. During practice lab sessions, most medication vials were donated items that were often expired. He

11

incorrectly assumed that the labels on vials used during the OSCE exam were also irrelevant to the testing process.

66.     Once Professor Bernard notified Doe of the basis for his alleged failing scores on the OSCE, Doe became concerned for three reasons.

67.     First, the mistake that he made could have been easily remedied on the retake if the PA Program had provided even the most basic remediation in the form of a conversation with his faculty advisor, as was required under the Student Handbook. During the retake, which was video recorded, Doe did verbalize the point that in an actual clinical setting, he would examine the vial to determine if it was the appropriate medication, but he did not actually compare the label on the vial to the medication that he was supposed to administer given the 6-minute time limited assessment. The OSCE instructions provided in advance of the exam notify students that they should "verbalize inspection when it may not be obvious as to what you are doing." Doe did just that with respect to his inspection of the vials. It is clear that he would have taken the small extra step of visually comparing the label to the medication order on the November 20, 2020, retake if he had received appropriate remediation following the November 18, 2020, OSCE.

68.     Second, although Doe was informed that he made the same mistake on both exams, he received a 60% score on Station 6 of the first OSCE and an 85% score on Station 6 of the second OSCE, suggesting significant inconsistency in assessment.

69.     Third, Doe's 85% score on Station 6 of the November 20, 2020, OSCE was reduced to a failing score post-assessment, but he was neither informed of the revised score nor provided with an explanation of why the change was made post-assessment, rather than scored accurately during the exam.

70.     Doe appealed his dismissal to Dean Abraham.

12

71.     On December 22, 2020, Dean Abraham notified Doe that she was granting his appeal. She informed him, "[y]ou will have one final attempt to successfully pass the end-of-term OSCE after a period of remediation. If you are successful in completing the OSCE, you will move into the full clinical training phase of the program." She added, "[f]ailure to pass the OSCE on the final attempt will result in permanent dismissal from the PA program." Finally, she notified Doe that "you will remain on probation for the remainder of your time in the PA program. Any future failure of a rotation, course, OSCE, or program competency examination will result in permanent dismissal from the PA program." In sum, this was Dean Abraham's proposed remediation contract on behalf of Defendant to Doe.

72.     Given his disability, Doe did not sign Dean Abraham's proposed contract.

73.     Rather, on December 31, 2020, Doe requested that Dean Abraham modify the terms. Doe informed her of the negative impact all of the continued and repeated cycles of dismissal, appeal, and reinstatement had on his ability to manage his anxiety. He asked her to remove the inappropriate threat of automatic, permanent dismissal.

74.     And, in practice, an automatic and permanent dismissal condition without regard to circumstances, was not a term Doe, as an African-American, disabled student at a predominantly non-African-American educational institution, could readily accept.

75.     On January 12, 2021, Dean Abraham denied Doe's request for modification.

76.     Doe had enrolled in a single course for the spring 2021, semester – PA 599 – which was a remedial clinical short course with his faculty advisor as the instructor. The OSCE retake was scheduled for February 19, 2021. Doe performed well on his assignments throughout the remediation course.

13

77.     On February 19, 2021, Doe arrived at the designated exam room and discovered that he would be taking the OSCE in a non-standard testing environment. Previous OSCE assessments had been conducted in a closed room with the student, a remote evaluator, and/or a simulated patient in an applicable station. The OSCE assessment on February 19, 2021, however, was conducted in an open lab segmented by curtains with approximately 7-9 evaluators and staff present (3 in-person and approximately 4 to 6 remotely). As alleged, *supra*, Doe's accommodations required a quiet, distraction-free environment, which was also the standard procedure for previous OSCE examinations. And the syllabus for PA-599 noted that accommodations would be observed. Doe's faculty advisor Francis and instructor in this course was aware of his disability and accommodations.

78.     Doe was not notified prior to the OSCE retake that his accommodations would not be provided. In the OSCE setting, a quiet, distraction-free environment should have been limited to an evaluator (whether remote or in-person), a patient, and the student being tested. The presence of multiple evaluators and other individuals within the testing environment was extremely distracting at the outset for Doe and contributed to an exacerbation of his SAD, resulting in a debilitating anxiety attack. As the result, Doe scored below the benchmark on one of the six stations of the examination, which sufficed to cause his failure on the entire exam.

79.     Upon information and belief, Defendant had offered a more favorable and distraction-free OSCE retake environment to Doe's non-African-American colleague above. Contrary to Doe, she, thus, ultimately succeeded in her retake.

80.     That *very* same day, Professor Schempp notified Doe that the PRC had met and voted to dismiss him a *fourth* time from the PA Program.

14

81.     On February 22, 2021, Professor Schempp formally notified Doe of the dismissal.
She cited his failure "to pass the OSCE at the conclusion of PA-599, which also resulted in a failing
grade in the course."  No mention was made that Doe presented a danger to patient safety.

82.     Doe appealed his dismissal to Dean Abraham, citing the school's failure to provide
his testing accommodation of a quiet distraction-free environment and asserting a request for a
policy adjustment permitting him to retake the station that he failed.  Doe also raised the unique
challenges he faced as an African-American, minority student at Defendant's institution.

83.     It was only after Doe appealed the dismissal that Defendant began to post-hoc
justify its dismissal of Doe on "patient safety" grounds.  That is, on February 25, 2021, Dean
Abraham denied Doe's appeal and reinstatement, stating that "[r]reading for accuracy in a clinical
environment is required for patient safety.  Therefore, I am denying your appeal."

84.     Upon information and belief, between February 25, 2021 and March 2, 2021 Dean
Abraham published this statement to other Defendant employees, including Adrienne Bloss, who
was Defendant's Provost at the time ("Provost Bloss").  Upon information and belief, Dean
Abraham also caused this statement to be placed in Doe's permanent academic file.

85.     Dean Abraham's statement, in context, conveyed the implication and insinuation
that Doe posed a danger to patients in a clinical setting and was, thus, unfit for a career as a PA or
in any healthcare setting.

86.     On March 2, 2021, Provost Bloss denied Doe's subsequent appeal, stating, "I am
unable to uphold your appeal.  While I applaud the significant improvement you have made in
your didactic courses, I cannot overlook the ongoing concerns regarding safety and critical
decision making that were raised in your final OSCE attempt."  She continued, the PA Program

"maintains a necessarily high standard for sending students into their clinical year, and I must uphold that standard. Accordingly, your dismissal from the program will stand."

87.    Like Dean Abraham's statement above, Provost Bloss's statement, in context, conveyed the implication and insinuation that Doe posed a danger to patients and was, thus, unfit for a career as a PA or in any healthcare setting. Further, it implied and insinuated that Doe lacked critical decision-making skills, particularly due to Doe's disability of which Defendant was aware.

88.    Indeed, Doe had notified Provost Bloss he had a medical condition and had experienced a denial of accommodations on the OSCE retake of February 2021.

89.    Provost Bloss copied Dean Abraham and Defendant employees Jeanne Hoffman, who was Provost Bloss's executive assistant, and Emily Hollins, who was Defendant's registrar, on the above denial. Upon information and belief, Provost Bloss likewise caused her statement concerning "safety" issues and "critical decision making" ability to be placed in Doe's permanent academic file.

90.    Subsequently, on April 12, 2021, President Tracy Fitzsimmons ("President Fitzsimmons"), denied Doe's subsequent appeal. She stated in writing that Doe's "dismissal was due *solely* to concerns for patient safety." President Fitzsimmons added, "[i]f I can assist you in some manner to pursue another program in a health-related field, please let me know."

91.    Upon information and belief, President Fitzsimmons forwarded this statement to one or more other Defendant employees, including Defendant's registrar, similarly causing the correspondence to be published in Doe's permanent academic file.

92.    Similar to the other statements above, President Fitzsimmons's statement, in context, conveyed the implication and insinuation that Doe posed a danger to patients and was, thus, unfit for a career as a PA or in any healthcare setting.

16

93. The inclusion of the above statements in Doe's permanent academic file has foreclosed Doe's opportunity to apply to any other PA or healthcare educational program. Indeed, should Doe apply, prospective programs will view the false and stigmatizing statements and deny Doe admission.

94. Again, prior to the above appeal process, no concern was ever "ongoing" and raised that Doe posed a danger to patient safety. Additionally, Doe's two-year academic record in the PA Program refute such concern or any allegation that he posed such a danger.

95. Certainly, had a threat to patient safety existed, Defendant had a specific avenue to pursue under the Student Handbook, which authorized Defendant to promptly remove a student. It did not follow that avenue but, again, deviated from its usual course in dealing with Doe.

96. Finally, if Defendant, acting through the above individuals, truly believed Doe posed any potential safety threat to patients, it would not have suggested in the course of his appeal process that he pursue the option of a transfer to another related health field. In fact, by and through her designee, President Fitzsimmons astonishingly recommended Doe *pursue a nursing program.*

97. These suggestions on the whole cause an inference that Doe posed no danger or patient safety issue and, thus, the basis for his dismissal was pretextual in nature, relating to his disability and race.

98. While Doe made errors unrelated to patient care skills and safety on the November 2020, OSCEs and his February 2021, OSCE, such errors occurred in periods of extreme anxiety following a continuing cycle of improper and harassing dismissals, appeals, and reinstatements. The anxiety that Doe experienced when taking the final assessments necessary to pass into the clinical year of his program was not comparable to the typical stress that a PA might experience when seeing a patient. Rather, Defendant put Doe in a hyper-scrutinized position where he knew

17

that any error would likely lead to his dismissal. It increased the likelihood that he would make

such an error by failing to provide remediation following his November 18, 2021 OSCE, by failing

to provide a quiet distraction-free environment in his February 2021, OSCE, by providing a non-

standard testing environment, and by ratifying such situation in the appeal process.

99. All of the above Defendant employees are Caucasian.

100. Upon information and belief, Defendant dismissed no other student from the Class

of 2021.

101. Under the totality of facts and circumstances, *supra*, Defendant violated Title III of

the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and Title VI

of the Civil Rights Act of 1964. It did so when it engaged in a continuous, harassing, and hostile

14-month effort to target Doe and dismiss him from its PA Program. Moreover, Defendant's

statements against Doe relating to "patient safety" and "critical decision making" are false,

imposed a stigma of professional unfitness upon him, and erroneously regarded his disability as a

danger, foreclosing a health-care education and career. Because these false statements were not

made in good faith and with discriminatory animus, they are defamatory, *per se*.

102. In the end, Defendant's dismissal of Doe from the PA Program was not the result

of Doe's lack of ability, effort, intelligence, knowledge, or qualifications. Rather, it was the pre-

determined outcome of a continuing pattern of discriminatory treatment and a hostile learning

environment against Doe due to his race and disability. Doe, thus, seeks relief here.

## COUNT 1
### Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Race Discrimination)

103. Doe incorporates and re-asserts fully herein the allegations of paragraphs 1 through

102, *supra*.

104. Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United

18

States shall, on the ground of race . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (alteration added).

105.    In violation of Title VI, Defendant subjected Doe to discrimination and a hostile learning environment and excluded him from the PA Program. Defendant did so on the ground of Doe's race.

106.    Defendant receives federal assistance and funding in its educational programs and activities, including the PA Program.

107.    As an African-American, Doe was a member of a protected class, subject to the protections of Title VI.

108.    At all times relevant, Doe was qualified for the PA Program.

109.    Doe suffered adverse actions in the PA Program, as alleged above. Ultimately, the adverse actions included his permanent dismissal.

110.    The adverse actions, including his dismissal, occurred under circumstances giving rise to an inference of race discrimination. Specifically:

(a)    Doe's Class of 2020 and Class of 2021 were predominantly non-African-American;

(b)    Upon information and belief, none of Doe's African-American classmates in the Class of 2020 graduated from the PA Program;

(c)    Doe was the only student in the Class of 2021 whom Defendant dismissed;

(d)    Defendant's employees, *supra*, with whom Doe dealt were Caucasian;

(e)    In dealing with Doe, Defendant suspiciously deviated from its Student Handbook policies in the disciplinary process, accelerating the process toward the ultimate sanction of dismissal, disregarding lesser sanctions, and imposing inappropriate, unrealistic, and unreasonable

19

conditions upon Doe for his continued enrollment in the PA Program;

(f)     Defendant continuously subjected Doe to a severe, pervasive, and unwelcome cyclical disciplinary process, resulting in threats, repeated dismissals, reinstatements, and appeals, thus changing the conditions and terms of Doe's enrollment;

(g)     Defendant disregarded the significant academic progress Doe had made;

(h)     Defendant dismissed Doe, citing for the first time on his appeal from the dismissal the false and pretextual "patient safety" and "critical decision making" issues;

(i)     All at the same time, Defendant treated Doe's non-African-American classmate far more favorably in the course of her disciplinary process and academic experience.  Defendant did so even though the student had engaged in more egregious conduct (i.e., receiving an "F" grade, failing to achieve a cumulative 3.0 G.P.A. altogether), allowing that classmate substantial remediate efforts and not once threatening her with an automatic dismissal or even ultimately dismissing her from the PA Program. Ultimately, Defendant graduated this student, not Doe. This instance of disparate treatment in context, *supra*, suggests an impermissible racial animus.

111.     Defendant's conduct above was intentional, deliberate, willful, wanton, malicious, reckless, and in conscious disregard of Doe's right to be free from race discrimination.

112.     As a direct and proximate cause of the same, Doe has suffered significant and permanent personal and professional injuries.   These injuries include anxiety, distress, embarrassment, exacerbation of his disability, exclusion, humiliation, isolation, pain and suffering, rejection, shame, and stigma. Additionally, Doe has suffered injuries in the form of economic loss, including a loss of a graduate education, tuition, fees, and expenses incurred, past, present, and future income and earning capacity, and permanent exclusion from a chosen career as a PA or in any health-care provider capacity.

20

113.    Accordingly, Doe requests this Court grant him the relief requested, *infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

**COUNT II**
**Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182**

114.    Doe incorporates and re-asserts fully herein the allegations of paragraphs 1 through 113, *supra*.

115.    Title III of the Americans with Disabilities Act ("ADA") requires that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns . . . or operates a place of public accommodation." 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

116.    At all times relevant, Defendant was a private educational institution, was place of public accommodation, and accepted federal financial assistance and funding in its programs and activities.

117.    Doe is disabled under the ADA. He suffers from a chronic mental health condition, namely SAD. SAD substantially impairs Doe's major life functions of communicating, concentrating, interacting, learning, socializing, and thinking. These impairments, for Doe, are substantial as compared to persons in the general population.

118.    Defendant, which was aware of Doe's actual disability, also erroneously regarded Doe as more disabled than he actually was and, as such, unfit for the PA Program.

119.    At all times, Doe was otherwise qualified for the PA Program and capable of performing all essential functions and requirements, with or without accommodations.

120.    Motivated by Doe's disability, Defendant deliberately, intentionally, and/or recklessly excluded Doe from equal access to and participation in the PA program, in violation of

21

the ADA. Defendant did so through a denial of accommodations, discrimination, a hostile learning environment, and dismissal from the PA Program.

Denial of Accommodations

121.   Doe incorporates and re-asserts fully herein the allegations of paragraphs 1 through 120, *supra*.

122.   Defendant owed Doe a duty to provide necessary and reasonable accommodations.

123.   Nonetheless, Defendant breached this duty by failing to provide Doe accommodations on his February 19, 2021, OSCE retake exam.

124.   Doe's requested accommodation of a quiet, distraction-free environment for examinations, including the OSCE retake, *supra*, was reasonable and necessary, imposed no undue burden on Defendant, and required no fundamental alteration or modification of the PA Program.

125.   Defendant approved the above accommodation, acknowledging its reasonableness, but then on Doe's OSCE retake and without any explanation denied it.

126.   Defendant was fully aware of Doe's disability and need for the above accommodations but disregarded that need deliberately, intentionally, and/or recklessly.

127.   In refusing his accommodations on the OSCE retake, Defendant engaged in no meaningful interactive process with Doe. Rather, upon Doe's complaint to Defendant about the absence of the accommodation, Defendant ignored Doe and proceeded swiftly through the dismissal process. Defendant did so knowing that Doe's failure on the OSCE retake was a result of a denial of an accommodation.

128.   Had Defendant provided Doe his accommodation, Doe would have passed the OSCE retake examination. Indeed, Doe had demonstrated significant progress proceeding the OSCE examination, despite the difficult circumstances he was forced to meet

22

129.    With the accommodation requested, Doe met and could have performed all essential eligibility requirements and standards of the PA Program.

130.    Defendant's failure to accommodate Doe was the proximate cause of Doe's harms herein.

131.    As a direct and proximate cause of the same, Doe has suffered significant and permanent personal and professional injuries, including anxiety, distress, lost earning capacity, embarrassment, exacerbation of a disability, exclusion, humiliation, isolation, loss of a professional career as a PA and health care provider, pain and suffering, rejection, shame, stigma, and tuition, fees, and costs.

132.    Accordingly, Doe requests this Court grant him the relief requested, *infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

<u>Disability Discrimination (Actual and Regarded-As)</u>

133.    Doe incorporates and re-asserts fully herein the allegations set forth in paragraphs 1 through 132, *supra*.

134.    Motivated by Doe's disability, Defendant subjected Doe to discrimination in the form of the above denial of accommodations, hyper-scrutiny, harassment, a hostile learning environment, and a pretextual dismissal from the PA Program.

135.    Specifically, and in addition to the allegations otherwise set forth in this Complaint, Defendant deliberately, intentionally, and/or recklessly:

(a)    Within mere weeks of learning of Doe's disability, dismissed him from the PA Program and deviated from policy thereafter;

(b)    Deviated from its Student Handbook policy in the disciplinary process, accelerating that process and Doe's dismissal, disregarding lesser sanctions, and imposing inappropriate,

23

unrealistic, and unreasonable conditions and terms upon Doe for his continued enrollment;

    (c)    Subjected Doe to a severe, pervasive, and unwelcome cyclical disciplinary process, resulting in threats, repeated dismissals, reinstatements, and appeals, thereby changing the conditions and terms of Doe's continued enrollment;

    (d)    Ignored the dramatic progress Doe had made in the PA Program;

    (e)    Hyper-scrutinized Doe;

    (f)    Pretextually dismissed Doe, citing for the first time on the dismissal appeal "patient safety," yet at the same time suggesting Doe pursue another health care related profession involving patient safety;

    (g)    Erroneously perceived and/or regarded Doe as lacking "critical decision making" ability;

    (h)    Denied Doe an accommodation on his OSCE retake exam and then, when he complained about it, disregarded his complaint; and

    (i)    Dismissed Doe from the PA Program and placed false and professionally fatal statements in his permanent academic file, foreclosing a profession as a PA and in healthcare altogether.

136.    Defendant's discrimination against Doe was the proximate cause of Doe's harms herein.

137.    As a direct and proximate result of the same, Doe has suffered significant and permanent personal and professional injuries, including anxiety, distress, lost earning capacity, embarrassment, exacerbation of a disability, exclusion, humiliation, isolation, loss of a professional career as a PA or healthcare provider, pain and suffering, rejection, shame, stigma, and tuition, fees, and costs.

138.    Doe, for this violation, requests this Court grant him the relief requested, *infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

## COUNT III
### Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

139.    Doe incorporates and re-asserts fully herein the allegations set forth in paragraphs 1 through 138, *supra*.

140.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 791, *et seq.*, ("Section 504") prohibits discrimination by organizations receiving federal financial assistance against otherwise qualified individuals with disabilities, and from prohibiting that individual's access to the programs or activities solely because of that disability.

141.    Defendant conducts a "program or activity" receiving federal financial assistance within the meaning of the Rehabilitation Act, including but not limited to the PA Program.

142.    For the same reasons Defendant violated Title III of the ADA, as set forth, *supra*, in paragraphs 114 through 138, Defendant violated Section 504.  Accordingly, Doe incorporates and reasserts here those paragraphs to allege this violation.

143.    Defendant's discrimination against Doe was solely the proximate cause of Doe's harms herein.

144.    As a direct and proximate cause of the same, Doe has suffered significant and permanent personal and professional injuries.  These injuries include anxiety, distress, embarrassment, exacerbation of his disability, exclusion, humiliation, isolation, pain and suffering, rejection, shame, and stigma.  Additionally, he has suffered injuries in the form of economic loss, including a loss of a graduate education, tuition, fees, and expenses incurred, past, present, and future income and earning capacity, and permanent exclusion from a chosen career as a PA or in any health-care provider capacity.

25

145.   Doe, for this violation, requests this Court grant him the relief requested, *infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

## COUNT IV
### Defamation

146.   Doe incorporates and re-asserts fully herein the allegations of paragraphs 1 through 145, *supra*.

147.   Defendant employs Dean Abraham, Provost Bloss, and President Fitzsimmons. At all times relevant, these individuals were acting in the course and scope of their high-level employment with Defendant and in furtherance of Defendant's business.

148.   Dean Abraham, Provost Bloss, and President Fitzsimmons made and published the statements, *supra*, all of which were of and concerning Doe.

149.   The statements were false and defamatory.

150.   In context, the statements conveyed the message, implication, insinuation, and innuendo that Doe is dangerous, a patient safety threat, and mentally unfit for a career in a health-care profession.

151.   In context, the statements sting Doe, injuring his personal and professional reputation in the common estimation of mankind, throwing contumely, shame, or disgrace upon him, holding him up to scorn, ridicule, or contempt, and rendering him odious.

152.   In context, the statements were malicious, not made in good faith, and/or the result of ill-will toward, personal spite against, and a desire to harm Doe, including but not limited because of discriminatory animus toward Doe's race and disability.

153.   In context, Dean Abraham, Provost Bloss, and President Fitzsimmons made their statements on behalf of Defendant and against Doe knowing that they were false or acting in reckless disregard of their truth or falsity.

26

154.   Given the high-level position of these individuals, their statements constitute the statements of Defendant itself and, thus, Defendant's direct approval and authorization of, participation in, and ratification of the same.

155.   Defendant's defamation was the proximate cause of Doe's harms herein.

156.   As a direct and proximate cause of the same, Doe has suffered significant and permanent personal and professional injuries.   These injuries include anxiety, distress, embarrassment, exacerbation of his disability, exclusion, humiliation, isolation, pain and suffering, rejection, shame, and stigma.   Additionally, he has suffered injuries in the form of economic loss, including a loss of a graduate education, tuition, fees, and expenses incurred, past, present, and future income and earning capacity, and permanent exclusion from a chosen career as a PA or in any health-care provider capacity.

157.   Doe, for this defamation, requests this Court grant him the relief requested, *infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

## COUNT V
### Defamation *Per Se*

158.   Doe incorporates and re-asserts fully herein the allegations of paragraphs 1 through 157, *supra*.

159.   Defendant employs Dean Abraham, Provost Bloss, and President Fitzsimmons.   At all times relevant, these individuals were acting in the course and scope of their high-level employment with Defendant and in furtherance of Defendant's business.

160.   Dean Abraham, Provost Bloss, and President Fitzsimmons made and published their statements, *supra*, all of which were of and concerning Doe.

161.   The statements were false and the accusations, implications, insinuations, and innuendos therein mark, stigmatize, and sting Doe as too dangerous and mentally unfit for a health

27

care profession, including as a PA, involving patient safety.  They further imply a lack of fitness for such profession, prejudicing Doe.

162.    In context, the statements were malicious, not made in good faith, and/or the result of ill-will toward, personal spite against, and a desire to harm Doe, including but not limited because of discriminatory animus against Doe's race and disability.

163.    The statements undeniably lower Doe in the estimation of the community and will deter individuals from dealing with him ever again.  In fact, Doe informally approached another health care professional school, informed it of Defendant's statements, and learned the statements, in the opinion of this other school, rendered him inadmissible.

164.    Doe has suffered actual and significant pecuniary loss as a result of the statements

165.    Because the statements are *per se* defamatory, damages to Doe are presumed.

166.    Given the high-level position of these individuals, their statements constitute the statements of Defendant itself and Defendant's direct approval and authorization of, participation in, and ratification of the same.

167.    Defendant's defamation *per se* was the proximate cause of Doe's harms herein.

168.    As a direct and proximate cause of *the* same, Doe has suffered significant and permanent personal and professional injuries.  These injuries include anxiety, distress, embarrassment, exacerbation of his disability, exclusion, humiliation, isolation, pain and suffering, rejection, shame, and stigma.  Additionally, he has suffered injuries in the form of economic loss, including a loss of a graduate education, tuition, fees, and expenses incurred, past, present, and future income and earning capacity, and permanent exclusion from a chosen career as a PA or in any health-care provider capacity.

169.    Doe, for this defamation *per se*, requests this Court grant him the relief requested,

28

*infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons above, Plaintiff John Doe requests judgment in his favor against Defendant, and the following relief:

(a) $1,500,000.00 in compensatory damages;

(b) $350,000.00 in punitive damages;

(c) Reinstatement to the PA Program, on fair and just terms;

(d) Provision of the disability accommodations above and the opportunity to retake the OSCE examination with said accommodations;

(e) Expungement of any and all documents in his permanent academic file concerning his dismissal, patient safety issues, and lack of critical decision-making abilities;

(f) Attorney's fees, costs, and pre- and post-judgment interest; and

(g) Any such other and further relief as the Court may deem just and proper.

Plaintiff John Doe reserves the right to amend this Complaint to add additional claims and parties, as future discovery may warrant, and **DEMANDS A TRIAL BY JURY.**

**RESPECTFULLY SUBMITTED,**
JOHN DOE

By: _____
                Counsel

Nicholas F. Simopoulos, Esquire
Virginia State Bar No. 68664
Simopoulos Law, PLLC
11 South 12th Street, Suite 114
Richmond, Virginia 23219
Phone: (804) 220-5755
Email: nicholas@simopouloslaw.com
*Counsel for Plaintiff*

29