IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | | |
|---|---|---|---|
| JOHN DOE, | ) | | |
| Plaintiff, | ) | Civil Action No. 5:21cv00073 | |
| | ) | | |
| v. | ) | MEMORANDUM OPINION & ORDER | |
| | ) | | |
| SHENANDOAH UNIVERSITY, | ) | By: | Joel C. Hoppe |
| Defendant. | ) | | United States Magistrate Judge |

This matter is before the Court on Plaintiff John Doe's Motion to Compel Discovery

from Defendant Shenandoah University ("SU"). Pl.'s Mot. to Compel, ECF No. 41. The motion

has been fully briefed, ECF Nos. 42, 45, 47, and is ripe for disposition. For the reasons stated

below, the Court hereby GRANTS Doe's Motion to Compel, ECF No. 41, and DIRECTS

Defendant to send FERPA Notices to Students 2–11, Students 13–14, and Student 15.

I. Background

Doe brings claims for racial discrimination, disability discrimination, and defamation

arising out of Doe's enrollment in, and ultimate dismissal from, Shenandoah University's

Physician Assistant ("PA") Program. *See* Compl. ¶¶ 81, 103–69, ECF No. 1-2. According to the

Complaint, Doe's rocky experience in the program was not because of to a "lack of ability,

effort, intelligence, knowledge, or qualifications," but the "predetermined outcome of a

continuing pattern of discriminatory treatment and a hostile learning environment against Doe

due to his race and disability." *Id.* ¶ 102.

"Doe is African-American. He was born in Nigeria, emigrated to the United States, and

ultimately became a permanent resident here." *Id.* ¶ 7. He enrolled in the PA program in July

2018. *Id.* ¶ 9. Before matriculating, Doe encountered some difficult personal circumstances and

was diagnosed with social anxiety disorder ("SAD"). *Id.* ¶¶ 10, 13. Doe alleges that he was

1

"disabled" while suffering from the anxiety disorder. *Id.* ¶ 17. In his first semester in the program, Doe earned a 4.0 grade point average ("GPA"). *Id.* ¶ 12. After that first semester, Doe reduced his courseload for reasons "unrelated to academics." *Id.* He returned to the PA program in the summer of 2019, during which he took three credit hours and earned a 3.0 GPA. *Id.* ¶ 19. In his fall semester of that same year, Doe's GPA dropped to a 2.27. *Id.* ¶ 20. With his academic performance declining, Doe "registered with [SU's] disability services office and notified [SU] of his SAD" in early December 2019. *Id.* ¶ 24. He also requested testing accommodations, which were approved. *See id.* Specifically, Doe would be allowed "time and a half for all quizzes and examinations and [] testing in a quiet, distraction-free environment." *Id.*

Two weeks later, a professor informed Doe that SU's "Promotions and Retentions Committee ('PRC') had voted and recommended his dismissal from the PA Program." *Id.* ¶ 27. The reason it gave was that Doe's GPA "was 'significantly less than 3.0' and 'it would be a significant challenge [for Doe] to achieve academic success by the end of the Spring Semester.'" *Id.* ¶ 29. Doe alleges that the "PRC should not have been considering [his] dismissal" as a first-line sanction because, "pursuant to the policy in the PA Program's Student Handbook," dismissal was warranted only when a student earned a "D" or "F" grade or when his cumulative GPA had dropped below a 3.0 for two consecutive semesters. *Id.* ¶ 33. Doe never earned below a "C" during the fall of 2019, and his GPA had dropped below a 3.0 for only one semester. *See id.* ¶¶ 19–21, 33. Doe's professor rejected the PRC's recommendation after Doe raised the applicable policies. *Id.* ¶ 34. Doe was allowed to stay in the program, but he was placed on academic probation for the spring 2020 semester. *Id.* The professor "also imposed conditions upon Doe above and beyond academic probation." *Id.* ¶ 35. Specifically, "[h]e required Doe to increase his cumulative GPA [to] above 3.0 by the end of the spring 2020 semester and, if he did not do so,

[SU] was to dismiss him automatically. At the time, Doe's cumulative GPA was only a 2.4737."
*Id.* Doe asserts that this "automatic dismissal" term was contrary to the Student Handbook
policies. *See id.* He also "does not recall ever agreeing, certainly not voluntarily, to such a
condition." *Id.* ¶ 47.

Doe continued in the program on a formal remediation plan prepared by a different SU
faculty member, *see id.* ¶¶ 41–43, and completed his Summer Two classes with a GPA of 3.857,
*id* ¶ 45. In August 2020, the program director notified Doe that the PRC had again voted to
dismiss him, and that she accepted this recommendation because Doe's cumulative GPA was
2.93, which was below the 3.0 GPA required by the conditions of his academic probation. *Id.* ¶
46. Doe alleges that the PRC normally "offered more extensive remediation to students before
recommending dismissal." *Id.* ¶ 49. For example, Doe has reason to believe that one of his fellow
students in the Class of 2020, who was not African American, "was offered repeated remediation
support by the PRC after earning an 'F' letter grade, being dismissed [from the PA program] for
the same, and then, after reinstatement, failing to achieve the required 3.0 cumulative GPA in the
PA Program for more than two consecutive semesters." *Id.* ¶ 50. "After 16 months in the didactic
phase of the PA Program, this student had not attained a cumulative GPA of 3.0." *Id.* "Rather
than voting to dismiss her, the PRC extended her academic probation" and allowed this student
to "delay her promotion" to the clinical phase of the program so "she could complete a
comprehensive remediation plan to increase her cumulative GPA." *Id.*; *see also id.* ¶¶ 51–52.
"However, Doe, as a disabled, African-American, did not receive the same" degree of support
that SU customarily provided "to a student experiencing academic difficulties." *Id.* ¶ 52.

Doe appealed his dismissal in late August 2020. *Id.* ¶ 55. His appeal was granted on the
condition that if he did not achieve a 3.0 GPA by the end of the fall 2020 semester, he would be

automatically and permanently dismissed from the PA Program. *Id.* ¶ 56. Doe contends that condition was not allowed under the Student Handbook. *Id.* ¶ 57. Doe brought his cumulative GPA up to a 3.076 by the end of the fall 2020 semester. *See id.*

In December 2020, Doe was notified that the PRC recommended for a third time to dismiss him from the PA Program. *Id.* ¶ 58. This recommendation, which SU administrators accepted, was based on Doe's "fail[ure] to pass his fall 2020 Objective Structured Clinical Exam ('OSCE') after two attempts." *Id.* ¶¶ 58–59. "The OSCE is a time-limited practical exam conducted at the end of certain semesters in the PA Program and consists of a set of predefined stations related to patient care." *Id.* ¶ 60. The fall 2020 OSCE "took place on November 18, 2020 and consisted of six individually[] scored stations. Students were provided with a time limit of six minutes per station." *Id.* Doe "scored well above the benchmark [of 65%] on each station except Station 6 – Clinical Procedures. He was informed that he had allegedly scored a 60% on Station 6," but he was not told what aspect of the exam "he had done incorrectly." *Id.* Doe retook the Station 6 exam two days later. *Id.* ¶ 62. He "scored an 85% - 20 percentage points above the benchmark." *Id.* Nonetheless, SU administrators informed Doe that he "did not pass [his] retake for the Didactic Summative OSCE because [he] did not achieve the benchmark of 65% on the station [he] retested" on November 20, 2020. *Id.* ¶ 63.

Doe appealed his dismissal, *id.* ¶ 70, and was readmitted to SU's PA Program subject to a remediation contract that stipulated he would be permanently dismissed if he failed a "rotation, course, OSCE, or program competency examination," *id.* ¶ 71. Doe requested modification of the contract, specifically referencing the "negative impact all of the continued and repeated cycles of dismissal, appeal, and reinstatement had on his ability to manage his anxiety," *id.* ¶ 73, but his request was denied, *id.* ¶ 75. Doe retook the OSCE for a third time in February 2021. *Id.* ¶ 76.

This OSCE was held in a "non-standard testing environment," which Doe alleges did not comply with his accommodations requiring a "quiet, distraction-free environment." *Id.* ¶ 77 (alleging that "[p]revious OSCE assessments had been conducted in a closed room" with only the student, evaluator, "and/or a simulated patient" present (remotely or in person) at the station, whereas this OSCE took place "in an open lab segmented by curtains with approximately 7–9 evaluators and staff present," three of whom were in person and the rest of whom were remote). The unexpected "presence of multiple evaluators and other individuals within th[is] testing environment was extremely distracting at the outset for Doe and contributed to an exacerbation of his SAD, resulting in a debilitating anxiety attack." *Id.* ¶ 78 ("Doe was not notified prior to the OSCE retake that his accommodations would not be provided."). "As a result, Doe scored below the benchmark on one of the six stations of the examination, which sufficed to cause his failure on the entire exam," *id.*, and the related clinical course, *see id.* ¶ 81. Doe has reason to believe that SU administrators "offered a more favorable and distraction-free OSCE retake environment to [the] non-African-American" classmate described earlier in his complaint. *Id.* ¶ 79. Unlike Doe, that classmate passed her exam. *Id.*

On February 22, 2021, SU administrators informed Doe that he was being dismissed from the PA program because he failed the OSCE and clinical course. *Id.* ¶ 81. Doe appealed his dismissal, citing both SU's "failure to provide his testing accommodation of a quiet distraction-free environment" for the OSCE, as well as "the unique challenges he faced as an African-American, minority student" at the university. *Id.* ¶ 82. Various SU administrators denied Doe's appeals in February, March, and April 2021. *See id.* ¶¶ 83–90. Each denial was based on SU's purported position that Doe's performance on the OSCE raised "patient safety" concerns. *See id.* ¶¶ 83, 86, 90. Doe alleges that this "post-hoc" rationale for his dismissal from the PA Program

was pretextual, *id.* ¶ 83, and that SU in fact dismissed him based on his race and disability. *See generally id.* ¶¶ 94–102.

*

Doe brings five claims in his Complaint. In Count I, Doe alleges that SU discriminated against him because of his race and subjected him to a racially "hostile learning environment," each in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Compl. ¶¶ 104–12. In Counts II and III, Doe alleges that SU failed to accommodate his disability and discriminated against him, based on his disability, by subjecting him to "a hostile learning environment" before dismissing him from the PA Program, in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, respectively. Compl. ¶¶ 115–37 (Count II, ADA), 140–44 (Count III, RA). Counts IV and V assert defamation claims under Virginia law. *Id.* ¶¶ 147–56, 159–68; *see Doe v. Shenandoah Univ.*, No. 5:21cv73, 2022 WL 2525729, at *5 (W.D. Va. July 7, 2022) (Cullen, J.) (denying SU's Rule 12(b)(6) motion to dismiss Doe's defamation claims).

## II. Procedural History

Doe served SU with his first set of Interrogatories and Requests for Production ("RFPs") in March 2022. Doe sought two kinds of materials or information at issue in his pending motion to compel. *See* Pl.'s Mot. 1–2, ECF No. 41. First, he asked SU to produce "[a]ny and all audio and visual recordings of Doe taking the OSCE on (a) November 18, 2020[;] (b) November 20, 2020[;] and (c) February 19, 2021." Pl.'s Br. in Supp. Ex. 1, ECF No. 42-1, at 21 (RFP No. 31); *see* Pl.'s Mot. 2. SU produced video of the February 19, 2021 OSCE, but it did not produce a

6

recording of Doe's performance on either OSCE in November 2020. *See* Pl.'s Reply Ex. 6, ECF No. 47-3, at 2–3.

Second, Doe sought information about other SU students that could help him identify potential comparators for his claims that SU discriminated against him because of his race, in violation of Title VI (Count I), and because of his disability, in violation of the ADA (Count II) or § 504 (Count III).[1] *See* Disc. Order 2–3 & n.2, ECF No. 34; Letter from N. Simopoulos to E. Geller (May 23, 2022), ECF No. 31, at 7–10. Specifically, he asked SU to identify and produce information about any current or former student: (1) who the PRC voted to dismiss from the PA Program in each academic year from 2017 to the present, regardless of the PRC's reason(s) for recommending dismissal (Interrog. No. 10 & RFP No. 23); or (2) who had "failed the Summative OSCE three times" between the beginning of the 2017 academic year through the present (Interrog. No. 12 & RFP No. 25). *See* Pl.'s Br. in Supp. Ex. 1, ECF No. 42-1, at 11–12, 20. Doe also sought certain statistical and demographic information about the PA Program's classes of 2018, 2019, 2020, and 2021 (Interrog. No. 13 & RFP No. 26). *Id.* at 12, 20. Interrogatory No. 10 directed SU to provide the following information for each identified student:

(a)   The date(s) of the PRC's recommendation(s) or vote(s);
(b)   The reason(s) in support of the recommendation(s) or vote(s);
(c)   If the student appealed the PRC's recommendation(s) or vote(s), the outcome of the appeal(s), including the name of the faculty member(s) deciding the appeal(s);
(d)   The color and race of the student;

---

[1] Title VI, the ADA, and § 504 all prohibit intentional discrimination, or "disparate treatment," based on a person's protected characteristic. *See generally Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (Title VI); *A Helping Hand, LLC v. Balt. Cnty., Md.*, 515 F.3d 356, 362 (4th Cir. 2008) (ADA and § 504). In discrimination cases, "comparator" is a term of art for "a similarly situated [person] who is not a member of the plaintiff's protected class," *Tinsley v. City of Charlotte*, 854 F. App'x 495, 500 (4th Cir. 2021) (citing *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 718–23 (4th Cir. 2013)), and who the defendant "treated more favorably" than the plaintiff, *Laing*, 703 F.3d at 719. *See generally Laing*, 703 F.3d at 718–23 (explaining uses for comparator evidence in discrimination cases generally).

     (e)     Whether the student was disabled, and if so, the disability; and

     (f)     Whether the student ultimately graduated from the PA Program and, if so, the date of the graduation.

*Id.* at 11. SU generally objected to Interrogatory No. 10 "as overly-broad, unduly burdensome, consisting of multiple unrelated parts, and seeking irrelevant information." Pl.'s Br. in Supp. Ex. 2, ECF No. 42-2, at 4. It also objected that the interrogatory sought "confidential information relating to other students not parties to this action which cannot be provided [by SU] absent consent from the students at issue." *Id.* at 5. SU did not answer Interrogatory No. 10, and it did not provide any documents in response to RFP No. 23. *See id.* at 5, 9.

Interrogatory No. 12 sought similar demographic information about "any PA Program student, excluding Doe, who had failed the Summative OSCE three times" during the relevant time. *Id.* at 12. SU objected to Interrogatory No. 12 on confidentiality grounds, but nonetheless answered that "one student other than Plaintiff failed the Summative OSCE three times and was dismissed from the PA Program during the time period referenced." *Id.* at 6. It did not produce any documents related to this student. *Id.* at 9. On Interrogatory No. 13, SU responded that it did not have any information about "the racial background of students [or] whether any students are disabled." *Id.* at 7; *see id.* at 10 (RFP No. 26).

The parties brought their dispute over the comparator-related discovery to this Court in the summer of 2022.[2] *See* Disc. Order 3 ("Doe seeks to obtain information to compare his treatment to that of other PA students at SU."). The Court overruled SU's relevancy objections to Interrogatory Nos. 10, 12, and 13, *see id.* ("Th[is] sort of information is often highly relevant for claims of discrimination." (citing *Kelly v. FedEx Ground Package Sys., Inc.*, No. 3:10cv1265,

---

[2] Doe did not raise concern at that time about SU's failure to produce audio-visual recordings from the November 2020 OSCEs.

2011 WL 1584764, at *6 (S.D. W. Va. Apr. 26, 2011)), but modified Interrogatory No. 10 "to cover information for the academic years of 2017 through 2021 when Doe attended SU," *id.* ("Comparator information must be tailored to encompass information about students similarly situated to Doe." (citing *Kelly*, 2011 WL 1584764, at *6)). The Court also needed to protect the privacy of students who are not parties in this case. *Id.* (citing the Family Education Rights & Privacy Act ("FERPA"), 20 U.S.C. § 1232g, and associated regulation, 34 C.F.R. § 99.3). Accordingly, it directed SU to identify any non-party students using "identifiers other than the students' names in responding to the interrogatories." *Id.* The Court did not require SU to produce any of the corresponding documents (RFP Nos. 23, 25 & 26) at that time. *See id.* "After reviewing SU's interrogatory responses," however, "Doe [could] renew these document requests, limiting the number of non-party students whose [educational records] may need to be produced." *Id.*

SU supplemented its discovery responses in August 2022. For Interrogatory No. 10, it produced a chart identifying fourteen students, including Doe ("Student 1"), who the PRC had voted to dismiss from the PA Program between December 2016 and February 2021. *See* Pl.'s Br. in Supp. Ex. 2, Def.'s Comparator Chart, ECF No. 42-2, at 1–2 (sealed).[3] For each Student, the Chart contains: the Student's original cohort year; the date on which the PRC voted to dismiss the Student[4]; a generic statement of the PRC's "reason for dismissal"; a statement of whether the Student appealed the PRC's dismissal vote and, if so, the result; the Student's race; the Student's

---

[3] This Chart refers to Doe by his real name. The other thirteen students are identified as "Student 2" through "Student 14." Their real names are blacked out.

[4] Each vote has its own row on this chart. Doe's information appears in three rows—one for each of the dates on which the PRC voted to recommend Doe's dismissal from the PA Program. Each other Student's information appears in one row only, suggesting the PRC voted only once to recommend that Student's dismissal from the PA Program.

disability-related accommodation status; and the Student's graduation year, if any. *See generally id.*; *see also* Def.'s Br. in Opp'n 3 ("For each of the 14 students included, the chart provides *the exact reason* each [student] was dismissed, as well as the date of their dismissal, whether they appealed their dismissal, and the outcome of any appeals." (emphasis added)), ECF No. 45.

 Doe now renews his request (RFP No. 23) for educational records belonging to all other Students identified in SU's answer to Interrogatory No. 10. *See* Pl.'s Mot. 2; Pl.'s Br. in Supp. 6, 10–12; Pl.'s Reply 3–4. He argues that the Comparator Chart, which SU prepared using records exclusively within SU's control, is inadequate because it "provides an incomplete context," Pl.'s Br. in Supp. 6. The Students' records, on the other hand, will contain more detailed facts that are "highly relevant for Doe to prove disparate treatment in the PA Program . . . and the falsity of SU's characterization of Doe as presenting a 'patient safety' concern," which Doe alleges was pretext for discrimination. *Id.* at 1. *See also id.* at 9 ("[T]he comparator evidence . . . is highly relevant to Doe's discrimination claims, particularly disparate treatment and pretext."); Pl.'s Reply 3 (arguing that the Chart reflects "Defendant's version of events," including SU's stated reasons why Doe and the other Students were dismissed, and does not give Doe "a fair and independent opportunity" to develop his disparate-treatment claims). Thus, Doe seeks a court order compelling SU "to commence the consent and notification process concerning Students 2–14" on the Chart, as well as a "Student 15 identified in" Doe's supporting brief, pursuant to FERPA so that he may "examine and conduct discovery on the student comparator evidence without any further delay." Pl.'s Mot. 2 (citing Fed. R. Civ. P. 37(a)); *see* Pl.'s Br. in Supp. 6–7 & n.4, 12 & n.7. He also seeks a court order requiring SU "to produce the audio-video recording of Doe's November 20, 2020, OSCE [or], if unable to do so, [to provide] detailed evidence as to its destruction." Pl.'s Mot. 2.

SU opposes Doe's motion to compel. *See generally* Def.'s Br. in Opp'n 1–2, 6–17. It argues that its Comparator Chart contains "all the information" Doe needs to determine if any student outside his "protected class[es]—in this case a student who is <u>not</u> African American or <u>not</u> disabled—was subjected to demonstrably better treatment under identical circumstances." *Id.* at 1; *see also id.* at 1–3, 6–8, 10, 17. From SU's perspective, "[o]f course, it reveals that no such comparators exist." *Id.* at 8; *see also id.* at 11–12 ("There are no discernible patterns of disparate treatment reflected in the data."). "Even if the [C]hart revealed the existence of any similarly situated student who received better treatment than" Doe did, *id.* at 8, SU maintains Doe has provided "no compelling reason" why Rule 26(b)(1) allows him to inspect the Students' actual records, *id.* at 1. *See id.* at 7 ("Revealing confidential student data—specifically their names and personal information—does not have any bearing on the comparator analysis, would be burdensome to the University and the [S]tudents at issue, and is vastly disproportionate to the needs of this case."); *id.* at 10 ("[Doe] has everything he needs to assess whether he can advance a comparator analysis in this case. It would exceed the scope of Rule 26 to open up confidential student files under these circumstances, as such an intrusion would neither be relevant nor proportionate to the needs of this case."); *id.* at 14–15 (asserting that Doe's "proffered reasons for needing to" review the Students' files are meritless because "[a]ny such after-acquired evidence would not be relevant or admissible for his 'hostile leaning environment' claim").

Separately, SU asserts that Doe's retake of the OSCE on November 20, 2020, was not recorded because that exam took place "in the lab, which was not outfitted with cameras. In addition, there was an in-person proctor grading" Doe's exam that day, "so no Zoom feed was necessary." *Id.* at 5. Thus, SU argues that it cannot produce a recording that never existed.

### III. The Legal Framework

"All civil discovery" into nonprivileged matters "is limited in scope by Rule 26(b)(1) in two fundamental ways. First, the matter sought must be 'relevant to any party's claim or defense.'" *Va. Dep't of Corrs. v. Jordan*, 921 F.3d 180, 188 (4th Cir. 2019) (quoting Fed. R. Civ. P. 26(b)(1)). "Relevance is not, on its own, a high bar." *Id.*; *see, e.g.*, *In re Short*, No. 21-50463, 2022 WL 201659, at *5 (Bankr. M.D.N.C. Jan. 28, 2022) ("[A] fact must simply be germane to a claim or defense in the pleading and, in determining whether a discovery request is relevant, courts must look beyond the allegation of a claim or defense to the controlling substantive law." (quotation marks omitted)); *In re: Am. Med. Sys., Inc.*, MDL No. 2325, 2016 WL 3077904, at *4 (S.D. W. Va. May 31, 2016) ("Rule 26(b)(1) does not precisely define relevancy. Certainly, information is relevant if it logically relates to a party's claim or defense."). "Rule 26(b)(1) therefore imposes another requirement: discovery must also be 'proportional to the needs of the case.'" *Jordan*, 921 F.3d at 188 (quoting Fed. R. Civ. P. 26(b)(1)). "Proportionality requires courts to consider, among other things," *id.*, "the parties' relative access to relevant information, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit," Fed. R. Civ. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id.*; *see In re: Am. Med. Sys.*, 2016 WL 3077904, at *4 ("[R]elevancy in discovery is broader than relevancy for purposes of admissibility at trial." (quotation marks omitted)).

When a party fails to provide requested discovery, the requesting party may file a motion to compel its production. Fed. R. Civ. P. 37(a)(1). The party "resisting discovery, not the party moving to compel discovery, bears the burden of persuasion." *Eramo v. Rolling Stone LLC*, 314 F.R.D. 205, 209 (W.D. Va. 2016). Thus, once the moving party makes "a prima facie showing of discoverability," the resisting party has the burden of showing that the discovery sought either:

(1) is not relevant within the meaning of Rule 26(b)(1); or (2) "is of such marginal relevance that the potential harm . . . would outweigh the ordinary presumption of broad discovery." *Id.* (internal quotation marks omitted); *cf. Jordan*, 921 F.3d at 189 ("[U]nder Rule 26, the ultimate question is whether the benefits of discovery to the requesting party outweigh the burdens on the recipient."). "District courts generally have broad discretion in managing discovery, including whether to grant or deny a motion to compel." *Eramo*, 314 F.R.D. at 209 (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va.*, 43 F.3d 922, 929 (4th Cir. 1995)).

## IV. Discussion

A.    *Comparator Records*

The crux of the parties' dispute over the other Students' educational records is whether the Comparator Chart prepared and produced by SU contains enough information for Doe to fully develop his claims (and respond to SU's asserted defenses) that SU discriminated against him because he is African American, in violation of Title VI (Count I), and/or because he is disabled, in violation of Title III of the ADA (Count II), or § 504 of the Rehabilitation Act (Count III). "For each count, [Doe may] proceed under two possible frameworks to establish [his] claims: either by proffering direct or indirect evidence of . . . discrimination, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Tucker v. Sch. Bd. of the City of Va. Beach*, No. 2:13cv530, 2015 WL 10710926, at *3 (E.D. Va. Aug. 17, 2015) (summarizing the standard of review for Title VI, ADA, and § 504 discrimination claims on summary judgment), *rejected in part on other grounds by* 2015 WL 10690556, at *1 (E.D. Va. Sept. 30, 2015). Here, the parties focus on *McDonnell Douglas*, also called the "pretext framework," *id.* (quoting *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)). Pl.'s Br. in Supp. 1, 9–10; Def.'s Br. in Opp'n 4; Pl.'s Reply 4.

"Under the pretext framework, [Doe] must first establish a prima facie case [of discrimination] by proving a set of elements, which differ according to the count." *Tucker*, 2015 WL 10710926, at *3; *see Young v. W. Va. Univ.*, No. 1:21cv35, 2022 WL 816041, at *4 (N.D. W. Va. Mar. 17, 2022) (listing the prima facie elements of a Title VI discrimination claim in the education context (citing *Rowels v. Curators of Univ. of Miss.*, 983 F.3d 345, 355 (8th Cir. 2020)); *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 669–70 (4th Cir. 2019) (listing the prima facie elements of a discrimination claim brought under Title III of the ADA); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498–99 (4th Cir. 2005) (listing the prima facie elements of a § 504 discrimination claim brought in the education context). Generally speaking, however, Doe will need to produce evidence showing: (1) he belonged to the relevant protected class; (2) SU provided an educational benefit to its students; (3) Doe "'was eligible for th[at] benefit; and (4) [he] was not provided the benefit under circumstances giving rise to an inference of discrimination,'" *Thomas v. City of Annapolis, Md.*, 851 F. App'x 341, 346 (4th Cir. 2021) (discussing plaintiff's burden, on summary judgment, to make a prima facie showing of "discriminatory denial of an employment benefit" under VII and the ADA) (quoting *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649–50 (4th Cir. 2002) (cleaned up)). *See, e.g.*, *Neal v. E. Car. Univ.*, 53 F.4th 130, 135 (4th Cir. 2022) (discussing student's burden, on summary judgment, to make a prima facie showing of disability discrimination under the ADA); *Ke v. Drexel Univ.*, Civ. No. 11-6708, 2015 WL 5316492, at *18–19 (E.D. Pa. Sept. 4, 2015) (discussing student's burden, on summary judgment, to make a prima facie showing of racial discrimination under Title VI).

The fourth factor looks at whether a causal link exists between the plaintiff's protected characteristic and the disparate, less favorable treatment underlying his discrimination claim.

*Laing*, 703 F.3d at 719–20; *Lightner v. City of Wilmington, N. Car.*, 545 U.S. 260, 265 (4th Cir. 2008); *see Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981) ("The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection."). Doe need not "point to a similarly situated comparator" who received better treatment to establish causation. *Laing*, 703 F.3d at 720; *see Tinsley*, 854 F. App'x at 500 (noting that "a plaintiff may present a similarly situated comparator who is not a member of the plaintiff's protected class" to demonstrate prima facie causation, and explaining that "[c]omparator evidence is 'particularly probative' in determining whether an adverse . . . action was the result of discrimination[] because such evidence allows the fact finder to make an objective inquiry and to control for other explanations" (quoting *Laing*, 703 F.3d at 719–20)). Should he choose to do so, however, "the validity of [his] prima facie case [will] depend[] on whether that comparator is indeed similarly situated." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citing *Burdine*, 450 U.S. at 258). Doe would need to "show that he's similar 'in all relevant respects' to his comparator. Such a showing would include evidence that the [students] dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differing or mitigating circumstances that would distinguish their conduct or the [school's] treatment of them for it," *Thomas*, 851 F. App'x at 347 (cleaned up). *See Ke*, 2015 WL 5316492, at *18–19, *21, *28.

"[A] comparator's conduct need not be identical to the plaintiff's, or involve 'precisely the same set of . . . offenses occurring over the same period of time and under the same sets of circumstances'" to support the plaintiff's prima facie case. *Tinsley*, 854 F. App'x at 501 (quoting *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019)). "Nonetheless, the misconduct of the proposed comparator must be similar enough to [the misconduct] committed

15

by the plaintiff to ensure that courts do not 'confuse apples with oranges. In other words, apples should be compared to apples.'" *Id.* (quoting *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (cleaned up)). Assessing comparator information requires courts to examine specific facts about the nature, extent, and severity of the proposed comparator's misconduct, as well as how they were treated compared to the plaintiff. *See, e.g.*, *Balderson v. Lincare, Inc.*, 62 F.4th 156, 165–66 (4th Cir. 2023); *Cowgill v. First Data Techs.*, 41 F.4th 370, 382–83 (4th Cir. 2022); *Tinsley*, 854 F. App'x at 501–02; *Sook Yoon v. Seblius*, 481 F. App'x 848, 850–51 (4th Cir. 2012). The factual "similarity between the comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner*, 545 F.3d at 265; *see, e.g.*, *Tinsley*, 854 F. App'x at 501 (explaining that although the Fourth Circuit "typically frame[s] the issue whether two individuals are similarly situated as a fact question, this does not preclude a court from deciding as a matter of law that there is an insufficient basis for comparison to submit the question to the fact-finder," and holding that male plaintiff's female coworker was "not a valid comparator" for sex discrimination claim where the evidence adduced at trial showed "material" factual differences in the nature, extent, and seriousness of the coworkers' misconduct and disciplinary histories, neither employee was disciplined for engaging in a sexual relationship with the other, and plaintiff's "firing was not based on comparable acts of misconduct in which [coworker] also engaged").

If Doe makes a prima facie showing of racial or disability discrimination, the burden will shift to SU "to articulate some legitimate, nondiscriminatory reason," *Burdine*, 450 U.S. at 253, why SU treated Doe worse than other PA Program students who were not African American or who were not disabled, *see Laing*, 703 F.3d at 719–20. In its Answer, SU alleged that Doe "was dismissed [from the PA Program] following his failure of a critical exam three times—an exam

16

which is a prerequisite to continuing in the program." Def.'s Answer 15, ECF No. 7. SU's brief

sets out additional facts relevant to that defense. According to SU, "the reason [Doe] failed the

OSCE on two occasions was because he committed massive safety violations in attempting to

perform the skill being assessed—by injecting the wrong medication into a patient's arm." Def.'s

Br. in Opp'n 4. Doe then "failed his third and final OSCE attempt," triggering the PCR's fourth

and final vote to dismiss Doe from the PA Program, because he did not "conduct a physical

examination of a patient—which was the only task he was asked to perform in one of the six

stations tested." *Id.* at 5. SU denies Doe's allegation that it did not honor his disability-related

testing accommodations when administering that third exam, as well as his allegation that SU

allowed a Caucasian student to take the same exam in a "distraction-free" environment. Compl. ¶

79; Answer ¶¶ 77–79. Unlike Doe, that student passed her exam and graduated from the PA

Program. Compl. ¶ 79. "This student is included on the [C]hart as 'Student 12.'"[5] Def.'s Br. in

Opp'n 9.

Assuming SU's articulated reasons are sufficient to meet its burden of production, *St.*

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 522–23 (1993), Doe would "have an opportunity to

prove . . . that the legitimate reasons offered by [SU] were not its true reasons, but were a pretext

for discrimination," *Burdine*, 450 U.S. at 253. "A comparator may be used to show pretext[.]"

*Kellum v. Isle of Wight Cnty., Va.*, No. 2:18cv543, 2020 WL 3164962, at *15 (E.D. Va. Feb. 13,

2020) (citing *Laing*, 703 F.3d at 719), *adopted*, 2020 WL 1304083 (E.D. Va. Mar. 19, 2020).

Again, however, Doe would have to show that he and his proposed comparator(s) were similarly

---

[5] After Doe filed this motion, Student 12 executed a release authorizing SU to produce her educational records in response to Doe's discovery request. Def.'s Br. in Opp'n 9 n.5. SU has produced Student 12's records to Doe under the stipulated protective order, ECF No. 36. *Id.* Those records contain "information relating to the remediation offered to [Student 12] at various points during their tenure in the PA Program," among other matters. *Id.*

situated in all relevant respects. *Laing*, 703 F.3d at 720–22. The Court considers the adequacy of the Comparator Chart that SU prepared and produced in response to Doe's Interrogatory No. 10, *see* Fed. R. Civ. P. 33(b)(3), and Doe's motion to compel production of the Students' educational records as requested in his RFP No. 23, *see* Fed. R. Civ. P. 37(a)(3)(B)(iv), with this evidentiary framework in mind. *See, e.g.*, *Breiterman v. U.S. Capitol Police*, 324 F.R.D. 24, 29–31 (D.D.C. 2018) (discussing the *McDonnell Douglas* framework in granting Title VII plaintiff's motion to compel production of other officers' disciplinary records, and limiting production to the one category of misconduct that had "a sufficient nexus to [plaintiff's] alleged disciplinary infractions to bring complaints arising under that category within the scope of discovery" under Rule 26(b)(1)).

*

The Comparator Chart does not contain enough facts about any Student's alleged misconduct, or SU's response thereto, for Doe (or the Court) to determine if the Student is a valid comparator for Doe's Title VI, ADA, or § 504 disparate-treatment claims. *Cf. Thomas*, 851 F. App'x at 347 (looking to evidence showing whether the plaintiff and a potential comparator were "subject to the same standards" or "engaged in the same conduct *without such differing or mitigating circumstances* that would distinguish their conduct or the employer's treatment of them for it" (emphasis added)); *Tinsley*, 854 F. App'x at 501–06 (holding as a matter of law that male plaintiff's female coworker was "not a valid comparator" for sex discrimination claim where the evidence adduced at trial showed "material" factual differences in the nature, extent, and seriousness of the coworkers' misconduct and disciplinary histories, neither employee was disciplined for engaging in a sexual relationship with the other, and plaintiff's "firing was not based on comparable acts of misconduct in which [coworker] also engaged"). For example, the

Chart shows both Doe and Student 10 (a white student who "had accommodations" for a disability) were dismissed from the PA Program because they "failed [their] third attempt at Didactic Summative OSCE as part as PA599 remediation course after having failed first 2 attempts in [the] course." Comparator Chart 2 (Student 10, entry of Feb. 2020); *accord id.* at 1 (Doe, entries of Dec. 11, 2020, and Feb. 19, 2021). But, SU has further explained that Doe failed his third OSCE in February 2021 *specifically* because he did not "conduct a physical examination of a patient—which was the only task he was asked to perform in one of the six stations tested." Def.'s Br. in Opp'n 5. The Chart also shows that the PRC previously voted to dismiss Doe from the PA Program in December 2020, shortly after he failed the OSCE and the OSCE retake. *Id.*; *see* Comparator Chart 1 (Doe, entry of Dec. 11, 2020) ("Failure to pass Didactic Summative OSCE after 2 attempts"). But, again, SU has further explained the *specific* "reason [Doe] failed the OSCE on [those] two prior occasions was because he committed massive safety violations in attempting to perform the skill being assessed—by injecting the wrong medication into a patient's arm." Def.'s Br. in Opp'n 4.

Conversely, SU has not provided any facts explaining the specific reason(s) why Student 10, who is white, failed their OSCEs. *See* Comparator Chart 2; Def.'s Br. in Opp'n 10. Those missing facts are relevant to whether Doe, despite being "similarly situated" to Student 10, Def.'s Br. in Opp'n 10, "was treated differently" than them when his OSCE grade "was up for discussion," *Cowgill*, 41 F.4th at 382. *Compare* Def.'s Br. in Opp'n 10 ("As is clear from the chart, the University treated both students in the same fashion."), *with Cowgill*, 41 F.4th at 381– 82 (evidence that ADA plaintiff's "termination was prompted by call avoidance alone," but that her "similarly-situated" coworkers were terminated only "after engaging in at least one act of call avoidance[,] taking excessively long breaks[,] *and* committing attendance infractions" supported

prima facie showing of discrimination insofar as it "suggest[ed] that—for those without a disability—something more than call avoidance [was] required for termination").

Similarly, the Comparator Chart shows that the PRC voted to dismiss Students 2–9 and Students 11–14 from the PA Program because their GPAs were "below 3.0" and/or they received a "failing grade" in specific PA courses.[6] Doe alleges that he automatically received a failing grade in PA 599 when he failed his third OSCE in February 2021, *see* Compl. ¶¶ 78–81, and the parties dispute whether Doe's disability contributed to his poor testing performance that day. The Comparator Chart contains no facts to explain why SU's instructors gave Students 2–7, Student 9, and Students 11–14 failing grades in their courses. This missing information is relevant to whether Doe was in fact "similarly situated in all material respects," *Tinsley*, 854 F. App'x at 500, to any Student outside his protected class(es). *See Sook Yoon*, 481 F. App'x at 850–51.

The Chart also indicates that Doe was allowed to "continue on academic probation despite having [a] GPA below 3.0" whereas Student 5, Students 7–8, and Students 11–14 were allowed to "rematriculate" in the next Cohort Year—presumably without conditions—despite also having GPAs below 3.0. *See* Comparator Chart 1–2. All but one of those other Students is identified as White, Hispanic, or Asian. Student 13 is African American, but they did not receive disability-related accommodations. *See id.* Information about other Students' conditions or terms of enrollment in the PA Program bears both on whether Doe and his proposed comparators are similarly situated in all material respects and, if so, whether SU might have "engaged in a disparate application of its progressive discipline [policy] when [Doe] was up for discussion," *Cowgill*, 41 F.4th at 383. The Comparator Chart contains no such information. Student 12's

---

[6] Students 2–5, 7–8, 11–12, and 14 are identified as White, Hispanic, or Asian. Students 6, 9, and 13 are identified as African-American students who did not receive disability-related accommodations. "Student 15," a white classmate identified in Doe's briefs, may also fall into this category. *See* Pl.'s Br. in Supp. 11; Pl.'s Reply 3 & n.2.

records, on the other hand, appear to contain additional factual "information relating to the remediation offered to [her] at various points during [her] tenure in the PA Program," among other matters. Def.'s Br. in Opp'n 9 n.5.

If these missing facts exist, they will be found in the Student's educational records themselves. *See, e.g.*, *Ke*, 2015 WL 5316492, at *18–19, *21, *28. Thus, Doe has shown the records belonging to Students 2–11 and Students 13–15 are discoverable because they contain nonprivileged, factual information relevant to Doe's prima facie claims of racial or disability discrimination, *see, e.g.*, *Tinsley*, 854 F. App'x at 500 (using comparator evidence to show causation) (citing *Laing*, 703 F.3d at 719–20), and to SU's anticipated defenses that PRC's reasons for voting to dismiss Doe from the PA program were based on legitimate academic or patient-safety concerns, *see Laing*, 703 F.3d at 719–20 (using comparator evidence to show pretext). His request to compel production of Student 12's records is moot.

**

The burden now shifts to SU, as the party resisting Doe's RFP, to show why information is "of such marginal relevance that the potential harm occasioned by" granting Doe's request "would outweigh the ordinary presumption of broad discovery." *Eramo*, 314 F.R.D. at 209. It has not done so. First, SU does not explain why "[i]t would exceed the scope of Rule 26 to open up confidential student files under these circumstances, as such an intrusion would be neither relevant nor proportion[al] to the needs of the case." Def.'s Br. in Opp'n 10. That assertion seems to follow SU's primary argument that Doe doesn't need to review the other Students' records because the Comparator Chart that SU prepared for Doe contains "all the information," *id.* at 1, he needs to determine if "any comparators exist," *id.* at 8, to support his claims that SU discriminated against him. *See generally id.* at 1–3, 6–8, 10, 17; Fed. R. Civ. P.

26(b)(2)(C)(i). From SU's perspective, "[o]f course, it reveals that no such comparators exist." *Id.* at 8. But Doe does not have to take SU's word for it. *DR Distributors, LLC v. 21 Cent. Smoking, Inc.*, 513 F. Supp. 3d 839, 975 (N.D. Ill. 2021) ("Opposing counsel doesn't get to decide what's important to the other side's case."). Under Rule 26, Doe is entitled to review the underlying records so he can decide for himself if any comparators exist and, if so, whether he should use those comparators' experiences to prove disparate treatment, pretext, or both. *See* Pl.'s Br. in Supp. 1, 5–6, 9–11.

Second, SU argues that Doe has provided "no compelling" reason, Def.'s Br. in Opp'n 1, 2, 7, for "unmasking [S]tudent identities and pouring [sic] through their confidential education records" in this case, *id.* at 7. It cites no authority suggesting that Doe must make a heightened showing before he can obtain the Students' otherwise discoverable records. *See Maggard v. Essar Global Ltd.*, No. 2:12cv31, 2013 WL 6158403, at *6–7 (W.D. Va. Nov. 25, 2013) (concluding that Rule 26(b)(1) governs party's request for non-party student's educational records and the requesting party has "no burden to show that he has a 'genuine need' for the information sought that outweighs [student's] privacy interests" because, "under FERPA, the only requirement is that the student be notified of [a] subpoena" before educational institution produces the student's records in response). Moreover, SU bears the burden to show why it should not have to produce those records, in a manner consistent with FERPA, in response to Doe's request. *See Eramo*, 314 F.R.D. at 209. Only fourteen Students' records are at issue here.[7] SU does not explain why it would be "burdensome [for] the University" to send FERPA Notices

---

[7] They are identified on the Comparator Chart as Students 2–11 and Students 13–14, *see* Pl.'s Mot. 2; Def.'s Br. in Opp'n 9 n.5, and in Doe's briefs as Student 15, *see* Pl.'s Mot. 2; Pl.'s Br. in Supp. 11; Pl.'s Reply 3 n.3.

to those Students or to produce the records in SU's custody. Def.'s Br. in Opp'n 7; *see id.* at 9 n.5 (noting that SU already produced Student 12's records under the stipulated protective order).

Finally, SU urges the Court to deny Doe's motion because the Students' records will contain new "after-acquired" information that "would not be relevant or admissible" in evidence to prove Doe's "hostile learning environment" theories of liability. Def.'s Br. in Opp'n 14 (citing *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 407 (4th Cir. 2022)). But "relevancy in discovery is broader than relevancy for purposes of admissibility at trial," *In re: Am. Med. Sys.*, 2016 WL 3077904, at *4, and "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable," Fed. R. Civ. P. 26(b)(1). This is not a reason to deny Doe's motion to compel SU's response to RFP No. 23. Accordingly, Doe's motion to compel, ECF No. 41, will be granted with respect to Students 2–11, Students 13–14, and Student 15.

B.    *The November 20, 2020 OSCE*

Doe's RFP No. 31 asked SU to produce "[a]ny and all audio and visual recordings of Doe taking the OSCE on (a) November 18, 2020[;] (b) November 20, 2020[;] and (c) February 19, 2021." Pl.'s Br. in Supp. Ex. 1, at 21. SU produced video of the February 19, 2021 OSCE, but it did not produce a recording of Doe's performance on either OSCE in November 2020. *See* Pl.'s Reply Ex. 6, ECF No. 47-3, at 2–3. Doe now seeks a court order requiring SU "to produce the audio-video recording of Doe's November 20, 2020, OSCE [or], if unable to do so, [to provide] detailed evidence as to its destruction."[8] Pl.'s Mot. 2. SU responds that Doe's retake of the OSCE on November 20, 2020, was not recorded because that exam took place "in the lab, which was not outfitted with cameras. In addition, there was an in-person proctor grading" Doe's exam that day, "so no Zoom feed was necessary." *Id.* at 5. Thus, SU argues that it cannot produce a

---

[8] Doe does not mention the first OSCE on November 18, 2020. *See generally* Pl.'s Br. in Supp. 7, 12–13; Pl.'s Reply 5–6.

recording that never existed. *See* Fed. R. Civ. P. 34(a)(1), 37(a)(3)(iv); *Burns v. First Nat'l Bank of Omaha*, No. 8:17cv289, 2018 WL 2463072, at *1 (D. Neb. June 1, 2018).

The Court agrees that SU cannot produce a video that never existed. But SU's statements leave some questions about whether the November 20, 2020 OSCE was recorded. In its brief, SU explains that in "2020 and 2021, . . . [SU] utilized Zoom as a platform for conducting some of the proctoring for the OSCEs in light of the ongoing Covid-19 pandemic, and those Zoom feeds were recorded to Zoom's cloud-based system." Def.'s Br. in Opp'n 4–5. SU asserts that the OSCE was proctored in person, so no Zoom feed was necessary. *Id.* at 5. In responding to Interrogatory 10, however, SU stated that three faculty members appeared in person and four faculty members appeared "remotely" for the OSCE. Pl.'s Reply, Ex 6 at 2–3. SU did not indicate how the four faculty members appeared remotely, but SU's other statements suggest that the remote appearance would have been by Zoom and that Zoom appearances were recorded. Thus, for SU to properly and completely respond to RFP No. 31, it must supplement its response and state (1) how the four faculty members appeared remotely, (2) whether that remote appearance was recorded, (3) whether the recording exists or ever existed, and (4) if the recording no longer exists, what happened to it. If SU locates the recording, it must produce the recording to Plaintiff. SU is directed to provide the supplemental response and production within fourteen (14) days.

## V. Conclusion

For the foregoing reasons, Doe's Motion to Compel, ECF No. 41, is hereby GRANTED with respect to Students 2–11, Students 13–14, and Student 15, and DENIED AS MOOT with respect to Student 12. Within fourteen (14) days from the date of this Memorandum Opinion & Order, Defendant Shenandoah University shall send the attached FERPA Order and Notice,

dated June 26, 2023, to each Student identified above. Subject to any restrictions or limitations placed on the requested information about Students 2–11, Students 13–14, and Student 15 during the FERPA process by the Court, SU is DIRECTED to produce to Plaintiff the student information within fourteen (14) days of the completion of the FERPA process. Any student information shall be treated as "Confidential" information under the Joint Stipulated Protective Order, ECF No. 36.

Doe's motion to compel is also GRANTED with the respect to any audio-visual recording of Doe's OSCE on November 20, 2020. SU is directed to provide the supplemental response and production within fourteen (14) days of entry of this Memorandum Opinion & Order.

IT IS SO ORDERED.

The Clerk of Court is directed to send certified copies of this Memorandum Opinion & Order to the parties.

ENTERED: June 26, 2023

Joel C. Hoppe
United States Magistrate Judge